# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs February 11, 2015

## CANDANCE CAROL BUSH v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. 68966     Mitchell Keith Siskin, Judge**

_____

**No. M2014-00824-CCA-R3-PC - Filed May 5, 2015**

_____

The Petitioner, Candance Carol Bush, appeals as of right from the denial of her petition for post-conviction relief. The Petitioner contends that she received ineffective assistance of counsel based upon trial counsel's advice that she not testify at trial and counsel's failure to file a motion to sever the Petitioner's case from that of her co-defendant. The Petitioner further contends that the cumulative effect of these errors undermines the confidence in the outcome of her trial such that she is entitled to post-conviction relief. After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

John Drake, Murfreesboro, Tennessee, for the appellant, Candance Carol Bush.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; William Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Facts and Procedural Background

This appeal involves a "cold case" from Rutherford County that went to trial some 26 years after the crime was committed. In 2008, the Petitioner and her husband, Gary W. Bush

("Defendant Bush"), were tried and convicted of first-degree murder in connection with the death of the Petitioner's first husband, Lynn Orrand, in 1982. Both the Petitioner and Defendant Bush were sentenced to life imprisonment.

On direct appeal, this court summarized the facts from trial, as follows:

*I. The Murder of Lynn Orrand*

In 1981, [the Petitioner] was married to the victim, Lynn Orrand. The Orrands and their two children, Terry and Gary, lived in a house on Peachtree Street in Murfreesboro. Lynn worked at North American Car while [the Petitioner] worked for a company called Gemtop. During this time, [the Petitioner] and Defendant Bush were coworkers at Gemtop. At some point in 1981, [the Petitioner's] younger brother, Kevin Patterson, came to live with the Orrands. Kevin had been kicked out of his parents['] house because his girlfriend was pregnant. Kevin lived with the Orrands until he married his girlfriend and moved in with her parents in December 1981.

On November 18, 1981, Lynn was returning home from work some time around 2:00 a.m. when he entered an unlocked side door to his garage. As Lynn entered the garage, he was struck in the head with "a tire tool" by an unknown assailant who then fled the scene. Gary Orrand later testified that on the night of the attack he woke up to the sound of his father, Lynn, calling for [the Petitioner] "to get the gun." According to Gary, [the Petitioner] went through the hallway crying, but "she wasn't hysterical." [The Petitioner] told Gary to "lay back down, it would be okay." Officer Ricky Keyt responded to the Orrand residence on the night of the attack. Officer Keyt testified that he remembered Lynn was bleeding from a cut under his right eye before he was transported to the emergency room. Officer Keyt did not observe any signs that the intruder had broken into the garage. Officer Keyt testified that witnesses described the assailant as a white male wearing a blue jacket with fur trim. Officer Keyt spoke with [the Petitioner] about the assault, and she told him that she had received two phone calls "from an unidentified person." [The Petitioner] told Officer Keyt that the caller had informed her "that her husband was selling drugs" and that "he had been seen going into a bar with two other women." Lynn was subsequently hospitalized, underwent surgery for his injuries, and missed two months of work.

Prior to the attack, Lynn had been hunting a large buck in the woods near the home of [the Petitioner's] parents. According to [the Petitioner's]

mother, Norma Jean Patterson, although Lynn had set up a tree stand in the woods, he would often hunt on a rock near a deer trail where "[h]e could sit ... [and] watch the deer." [The Petitioner] told her mother "not to tell anybody where [Lynn] was hunting at." On January 14, 1982, Lynn spoke with his coworker and friend, A.J. Mullins, about hunting for the buck that weekend. Later that night, Mr. Mullins remembered that deer season had ended and told Lynn he would not go hunting with him. Before they left work, Lynn told Mr. Mullins "that he changed his mind also" and would not go hunting that weekend. In the early morning hours of January 15, 1982, Kevin's girlfriend gave birth to their daughter Kimberly. Kevin spent that night at the Orrand house because there had been a significant winter storm and their house was near the hospital. That night, [the Petitioner] called her mother to tell her that Lynn was coming over to their property "early the next morning" to hunt for the buck. [The Petitioner's] mother overheard Kevin and Lynn talking in the background. According to [the Petitioner's] mother, the only people who knew Lynn would be hunting the next morning were [the Petitioner], Kevin, and herself.

On the morning of January 16, 1982, Gary Orrand woke up to hear [the Petitioner] and Lynn "[t]alking about going and killing a deer and them kind of joking." At approximately 6:00 a.m., [the Petitioner's] mother awoke to the sound of a truck pulling into her driveway. [The Petitioner's] mother looked out her window and saw Lynn's white pickup truck. [The Petitioner's] mother then heard the truck door slam and went back to sleep. Approximately 10 to 15 minutes later, [the Petitioner's] mother woke up again because her husband was getting out of bed. He told her that he had heard two gunshots and figured "Lynn has shot him a deer" so he would fix some coffee and wait for Lynn to come down to the house. [The Petitioner's] mother and father waited for Lynn until approximately 10:00 a.m. At that time, [the Petitioner's] mother became worried about Lynn and sent her husband and her youngest son, John Patterson, to the woods to check on Lynn. John saw one set of footprints in the snow leading from Lynn's truck and into the woods. John and his father followed these footprints until they found Lynn's body. John's father "rolled [Lynn's body] over" and attempted to resuscitate him. John told his father to stop because it was too late, Lynn was already dead. John then went back to the house to tell his mother to call the police.

[The Petitioner's] mother went with several police officers to [the Petitioner's] house in order to tell her that Lynn had been killed. When told, [the Petitioner] "just went, awwww" and grabbed her mother by the shoulder

and shook her saying, "If you had called the ambulance he might not would have died." [The Petitioner's] mother thought this was odd because [the Petitioner] had no reason to know that Lynn "had been laying out there in the snow . . . dead for several hours." [The Petitioner's] mother testified that [the Petitioner] "was acting a little weird," seemed "nervous," and "was and wasn't" upset when told about Lynn's death. [The Petitioner's] neighbor and friend, Lorraine Perry, testified that [the Petitioner] seemed "very calm" and "[n]ervous more than upset" that day. Ms. Perry did not remember [the Petitioner] crying that day and testified that she "cried more" than [the Petitioner] did. The next day, [the Petitioner] went to view Lynn's body at the funeral home with Lynn's twin brother, Glenn Orrand. According to Glenn, [the Petitioner] began crying and said "I want him back now" repeatedly. Shortly after the funeral, Kevin, his wife, and their child moved in with [the Petitioner] and her children for approximately two or three months.

* * * *

## II. The Police Investigation and Forensic Evidence

Chief Deputy Virgil Gammon of the Rutherford County Sheriff's Department was the lead investigator on the case in 1982. He received a call from the dispatcher about a shooting at approximately 10:30 a.m. on January 16, 1982. When he arrived, Chief Gammon saw Lynn's body lying on the ground next to a rock that "looked to have had some damage" to it. Lynn had been shot in the back near "the upper left shoulder." There were no footprints around the body but a search of the area revealed two sets of footprints near a tree approximately eight to ten yards from Lynn's body. There were no footprints between the body and the tree. Both sets of footprints appeared to be from the same person and "appeared to be comings and goings." Chief Gammon "believed that someone had been standing or sitting or waiting" for Lynn by the tree. Chief Gammon followed the footprints as they "circled around up [a] hill and back down the hill." The footprints continued on across Richland Road and back into the woods behind "three or four houses and came out" at an old, abandoned church down the street. Chief Gammon believed that the footprints leaving the scene were "at a faster pace or running" because of the stride and "distance between the steps." At one point along the footprints, the police discovered an area where the snow was disturbed. Chief Gammon believed that the assailant had fallen and dropped his gun. There were indentations in the snow that appeared to be where the assailant's knee touched the ground and where he placed his hand "trying to get up." There

-4-

was also an indentation Chief Gammon believed was of a "double barrel shotgun." At the abandoned church, police found "tire marks" in the snow showing "where a vehicle had been at one point." The police were able to determine that the footprints came from "a hunting style boot."

Michael Cawthorn, then the deputy coroner for Rutherford County, examined Lynn's body on January 16, 1982. Mr. Cawthorn observed "perforations" around the left elbow and a "one inch hole in the mid back." Mr. Cawthorn also observed "what appeared to be the outline of . . . something metallic under the left pectoral muscle." Mr. Cawthorn removed "a shotgun slug" from Lynn's body along with some "wadding" behind the slug. Mr. Cawthorn opined that the murder weapon was either a 12 gauge or 16 gauge shotgun and leaned "more toward a 12 gauge based on the amount of slug that was there." No autopsy was performed on the body in 1982. In 1982, Tennessee Bureau of Investigation (TBI) Assistant Director Lanny Wilder examined the shotgun slug recovered from Lynn's body. Assistant Director Wilder concluded that the slug was fired from a 12 or 16 gauge shotgun, but the slug's weight "was closer to a 12." Assistant Director Wilder concluded that the slug was a "rifled slug," which allowed the weapon to be fired with more accuracy. Assistant Director Wilder also opined that it would not be unusual for shotgun wadding to penetrate a body if the shot was fired from eight to ten yards away, especially if the wadding followed behind the slug.

Lynn's body was exhumed in 2007 and an autopsy was performed by Dr. Adele Lewis. The autopsy revealed a "large roundish shaped wound" and "multiple smaller wounds surrounding that" on Lynn's back. The slug traveled "through the ribs" and injured the spleen, left lung, and heart. Dr. Lewis opined that these injuries "would almost certainly be fatal within a matter of 30 seconds to a minute." Dr. Lewis also found "several small shotgun wounds" on the left arm, "right above [the] elbow." Dr. Lewis recovered several fragments from the body which she submitted to the TBI for testing. Dr. Lewis opined that the victim's wounds were consistent with having been "shot once with a slug . . . in the back" and having been struck by fragments from a second shot that struck a nearby rock. TBI Special Agent Robert Royse examined the fragments recovered from Lynn's body in 2007. Special Agent Royse concluded that one of the fragments was a piece of rock but that the other fragments were consistent with being from a deer slug.

### III. Kevin Patterson's Confession

In March 2007, police received information from Lonnie Butcher, an inmate at the Rutherford County jail, which implicated Kevin Patterson in Lynn's death. On March 17, 2008, Kevin pled guilty to one count of second degree murder for shooting Lynn and is currently serving a 25-year sentence. At [the Petitioner's] trial, Kevin testified that in the autumn of 1981, he moved in with [the Petitioner] and Lynn because he "wasn't getting along very good" with his father. Kevin was 17 at the time and a senior in high school. After moving in with the Orrands, Kevin learned that [the Petitioner] and Defendant Bush were "lovers" and were having an affair together. Kevin never told Lynn about the affair because he "didn't want to get [his] sister in trouble." [The Petitioner] wanted Kevin to meet Defendant Bush and "see what [he] thought about [Defendant Bush]." [The Petitioner] arranged for the two to meet at a local store. Kevin rode to the store on his bicycle and found Defendant Bush at a pay phone talking to [the Petitioner]. Defendant Bush introduced himself to Kevin and shook his hand. Kevin and Defendant Bush talked for "[m]aybe two minutes" before Kevin left. After Kevin learned about the affair and met with Defendant Bush, [the Petitioner] began to ask Kevin to kill Lynn. Kevin testified that [the Petitioner] asked him on "several occasions" to kill Lynn and that she would often do it while she was on the phone with Defendant Bush. However, Kevin testified that he could not remember the first time [the Petitioner] asked him to kill Lynn because he "put a lot of this stuff out of [his] mind because of what [he] did." [The Petitioner] told Kevin that she wanted Lynn killed because "she couldn't divorce him because he wouldn't leave her alone."

After being asked to kill Lynn, Kevin approached his friend Jason Riley and "asked him if he'd be interested in killing somebody for $5,000." Kevin had previously asked Jackie Young if he would kill someone for money, but Mr. Young had refused. Kevin decided to ask Mr. Riley because he was "a roughneck" and "was known to go out to . . . [construction sites] and steal[ ] shingles and supplies." Kevin told [the Petitioner], while she was on the phone with Defendant Bush, that Mr. Riley had agreed. A meeting was setup between Defendant Bush, Mr. Riley, and Kevin. Kevin testified that he could not remember where the meeting took place but that he picked up Mr. Riley. Defendant Bush was waiting for them in his black Ford pickup truck. All three men got into the truck, and Defendant Bush showed Mr. Riley an envelope that had money in it. Kevin testified that he got out of the truck while Mr. Riley and Defendant Bush discussed the details of the plan to kill

Lynn. On November 18, 1981, Kevin picked up Mr. Riley and drove him to Lynn's house. Kevin testified that Mr. Riley waited in the garage for Lynn and that when Lynn came home, Mr. Riley struck him over the head with "a bat or something another." [The Petitioner] told Kevin that the plan was for Mr. Riley to hit Lynn over the head and then drag his body to the road, but Mr. Riley "didn't knock [Lynn] out and [Mr. Riley] got scared and took off running." Kevin testified that he had been "riding around the neighborhood" for about 30 minutes waiting on Mr. Riley to kill Lynn when he picked Mr. Riley up "[d]own the road from the house." Mr. Riley was "scared to death" and told Kevin that he had hit Lynn but "it didn't knock him out." Lynn had started to fight back so Mr. Riley "took off running." Kevin dropped Mr. Riley off back at his vehicle and never spoke to Mr. Riley about the attack again.

After the failed attempt to kill Lynn in the garage, Kevin agreed to kill Lynn himself. [The Petitioner] and Defendant Bush devised a new plan. [The Petitioner] offered to let Kevin, his then girlfriend, and their child move into her house and to pay him $5,000 in exchange for killing Lynn. Kevin testified that the plan was for him to shoot Lynn while he was hunting for the buck in the woods near [the Petitioner's] parents' home. Kevin testified that Defendant Bush was to provide him with a shotgun and leave a station wagon with "a pair of coveralls, a pair of gloves, and a hat" inside at the "national guard armory." Kevin would then drive the station wagon to an abandoned church near the woods. Kevin testified that prior to the murder, he met with Defendant Bush at the Jackson Heights parking lot, where Defendant Bush gave him a double barrel shotgun "wrapped up in a blanket." Defendant Bush also gave him two sets of shotgun shells, a set of "regular shotgun shells" to use for target practice, and a set of deer slugs to use for the murder. Kevin put the shotgun and the shells into the trunk of the car, a Grand Prix owned by his girlfriend's brother. Kevin testified that his pregnant girlfriend was hidden, lying down in the seat, when Defendant Bush gave him the gun. Kevin also testified that after he married his girlfriend in December 1981, he moved in with her parents and practiced shooting at "some old junk cars out there" on his father-in-law's property, firing the gun twice.

On January 15, 1982, Kevin's daughter was born. According to Kevin, he had a conversation with [the Petitioner] about the murder that day. [The Petitioner] told Kevin that Lynn would be hunting on their parents' property the next morning and that after the murder, Kevin should go back to the hospital "and get in the room with [his] wife and make like [he had] been there

the whole time." Kevin also testified that [the Petitioner] spoke with Defendant Bush about the murder over the phone that day. Kevin spent that night at the Orrand house and woke up around 4:30 a.m.on January 16, 1982. [The Petitioner] and Lynn were drinking coffee and talking when Kevin woke up. Kevin testified that Lynn "was about to talk himself out of going [hunting] that morning" but that [the Petitioner] "was pushing him to do it." Kevin also testified that he remembered [the Petitioner] "at some point in time" having a phone "conversation with [her] mother . . . letting her know that Lynn was coming out there that morning to go hunting." Kevin left the Orrand house while it was still dark outside and before Lynn had left to go hunting. Kevin drove his wife's brother's car "to the national guard armory." As planned, there was a station wagon parked at the "armory" with the keys "under the floor mat." Kevin testified that when he got to the "armory," there were no other cars in the parking lot and the lights were off in the building. Kevin also testified that he had kept the shotgun in the trunk of his wife's brother's car since he got it from Defendant Bush. Kevin took the shotgun out of the car and put it in the station wagon. Kevin then put on the coveralls, gloves, and ski mask he found in the station wagon and drove toward his parents' house.

Kevin parked the station wagon at the abandoned church on Richland Road. It was cold and there was snow on the ground when he got to the church. Kevin "walked through the woods down close to where [his] father's property was at and then crossed the road and went up in the woods." Kevin walked to a tree where he crouched down and waited "for about probably 30 minutes or so." Kevin then heard Lynn's truck pull up the driveway, Lynn get out of the truck, and Lynn enter the woods. As Lynn approached Kevin, Kevin came out from behind the tree and "was probably 30 feet from [Lynn]" when he fired a shot. Kevin thought he missed Lynn so he fired a second shot. He knew he "didn't miss the second time" because he heard Lynn say, "You got me." Kevin testified that the two shells he fired at Lynn were both deer slugs. At the preliminary hearing in this case, Kevin testified that Lynn was walking toward him and facing him when he fired. After hearing Lynn say "You got me," Kevin "took off running." Kevin testified that he ran away from Lynn and the station wagon "up in the woods a little bit" before "running back toward where the car was at," going the same way back to the car as he had come. As he was running, Kevin "tripped over a log or a rock or something" and fell and dropped the gun in the snow. Kevin "reached down and picked the gun up and took off running again." When Kevin reached the station wagon, he put the gun in the back seat and drove back to the "armory" still wearing the coveralls, gloves, and ski mask. Kevin parked the station wagon

at the "armory," removed the coveralls, gloves, and ski mask and left them along with the gun in the station wagon. Kevin testified that he never asked and never learned what happened to the station wagon and the other items.

After leaving the station wagon at the "armory," Kevin drove to the hospital. Kevin testified that he "waited around out in the hallway until ... [he] didn't see any nurses around the nurse station." He then "snuck in [his] wife's room without anybody seeing [him]" and "made like [he had] been there a while" and "acted like [he] was asleep in the chair." Kevin's wife was asleep when he entered her hospital room. After she woke up, Kevin told her that he had killed Lynn. Kevin testified that she was upset, but he could not remember what she said. Kevin also testified that she had previously known about the plan to kill Lynn and that she helped him with his alibi. Kevin left the hospital and eventually went to [the Petitioner's] house, where their mother and "a bunch of detectives" were as well. Kevin was eventually questioned by the police, and he told them that he was at the hospital with his wife at the time of the murder. A few days after the murder and after having spoken with the police, Kevin realized that he "still had the same shoes on that [he] had on when [he] committed the crime." Kevin went behind a K-Mart and threw the shoes into a dumpster. Kevin testified that he could not remember what type of shoes he had worn during the murder. Kevin admitted that at the preliminary hearing, he had testified that he was wearing a normal pair of "lace up shoes." However, Kevin also testified that in the past he had owned a pair of Herman boots, that he could have owned a pair at the time of the murder, and that he considered Herman boots to be "lace up shoes." Kevin, his wife, and their child then moved in with [the Petitioner]. However, they did not live there long because [the Petitioner] and his wife did not get along so [the Petitioner] "kicked [them] out." Kevin testified that he never received the $5,000 but only got "$100 here, $100 there." Kevin also testified that sometime after the murder, he told Lonnie Butcher that he had killed Lynn for [the Petitioner and Defendant Bush].

After moving out of [the Petitioner's] house, Kevin "kind of stayed away" from [the Petitioner] because he "just couldn't look at them boys [Terry and Gary Orrand] in the face anymore." However, in 2007 Kevin was contacted by detectives who were reopening the investigation. Kevin testified that after he was contacted by the police, he went to [the Petitioner's] house and spoke to [the Petitioner and Defendant Bush]. [The Petitioner and Defendant Bush] told him to "stay calm and keep [his] mouth shut and just stick with the story." Kevin testified that over the course of the investigation,

-9-

he went over to [the Petitioner and Defendant Bush's] house "four or five" times and they would meet in the garage. To avoid "listening devices and all this," [the Petitioner and Defendant Bush] and Kevin would "whisper in real low voices while [they] [were] talking about it" and would sometimes "write notes and pass them instead of even talking." Kevin testified that they destroyed the notes. During this time, [the Petitioner and Defendant Bush] gave Kevin "about $1,000" to pay off his fines and fees related to his probation. [The Petitioner and Defendant Bush] gave Kevin the money on two occasions. The first time [the Petitioner] gave him money, and the second time Defendant Bush gave him money after "[h]e wiped all the money off removing any fingerprints on it." Kevin repeatedly denied to the police having any involvement in Lynn's murder. However, after meeting with an attorney, Kevin confessed to the police and agreed to testify and "tell the truth" against [the Petitioner and Defendant Bush] in exchange for a 25-year sentence. Kevin testified that he did not want to kill Lynn, but [the Petitioner] "brainwashed [him] into killing [Lynn]" in exchange for $5,000 and allowing Kevin and his family to move in with her. Kevin further testified that he felt "terrible" about what he did and that he would not have pled guilty and "volunteer[ed] to take 25 years if it wasn't the truth."

At trial, Kevin admitted to having prior convictions for passing worthless checks and theft of property valued less than $500. Kevin testified that he had a good relationship with Lynn and denied that he and Lynn had any conflicts or that Lynn did not want him to move into the Orrands' home. Kevin also denied that Lynn had kicked him out of the house prior to his having moved in with his wife's parents. On cross-examination, Kevin admitted that at the preliminary hearing, he testified that when Defendant Bush gave him the shotgun, it was not wrapped up and that he did not mention that his girlfriend was at the meeting. Kevin also admitted that he told the police he was given the gun one week before the murder. Kevin admitted on cross-examination that at the preliminary hearing, he testified that the station wagon had been left at the "armory" for a week prior to the murder. However, Kevin testified at trial that he could not remember when he got the shotgun or when the station wagon was left at the "armory." On cross-examination, Kevin testified that he finally decided to kill Lynn after his daughter was born, then he testified that it was after his wedding, and finally testified that he could not remember when he decided he would kill Lynn for [the Petitioner and Defendant Bush]. Kevin testified that he had trouble remembering the details because it happened so long ago and because he "blocked a lot of this stuff out of [his] mind because it was a very, very bad thing to do." At trial, [the

Petitioner and Defendant Bush] established that the national guard armory Kevin testified he picked up and dropped off the station wagon at was not built until 1984. However, Kevin testified that [the Petitioner and Defendant Bush] told him where to retrieve the station wagon and gave him directions on how to get there. Kevin further testified that he followed those directions. The State also established that there was another national guard armory located in Murfreesboro prior to 1984.

## IV. Corroborating Evidence

[The Petitioner's] mother, Gary Orrand, Kevin's brother John, and Terry all testified that Kevin had a good relationship with Lynn. However, Terry Orrand testified that [the Petitioner] and Lynn had a "rocky" relationship and that he could remember the two fighting "over finances." [The Petitioner] told her friend and coworker, Barbara Poague, that she was "not happy" with Lynn and that Lynn "hit her." [The Petitioner] also told Ms. Poague that she would not divorce Lynn because "Lynn would not leave her alone and he would take her boys away from her." Prior to his death, Lynn spoke with his brother Glenn about his life insurance policy. Lynn told Glenn that he was thinking about dropping his life insurance. Glenn asked Lynn if he had dropped his insurance a few weeks later, and Lynn said that he had not dropped it but had actually increased the amount of coverage. When Glenn asked Lynn about his life insurance, [the Petitioner] "grinned" and said, "Lynn, if something was to happen to you, if I would have you killed, I'd be a rich woman." Lynn had also spoken to his friend and coworker, Mr. Mullins, about his life insurance policy. Lynn told Mr. Mullins that his wife was the sole beneficiary of the policy. Mr. Mullins urged Lynn to make his children beneficiaries as well. Mr. Mullins testified that Lynn did not get the chance to change his policy before he died.

Several former Gemtop employees testified that it was common knowledge at Gemtop that [the Petitioner] was having an affair with Defendant Bush around the time of Lynn's murder. Ms. Poague confronted Defendant Bush about whether he had anything to do with the attack on Lynn in November 1981. Defendant Bush's ex-wife, Patricia Conner, testified that she met [the Petitioner] in October of 1981 or 1982 and that she "sort of suspected [Defendant Bush and the Petitioner] were going together." Defendant Bush and Ms. Conner divorced on August 29, 1983. [The Petitioner's] friend and neighbor, Ms. Perry, testified that she saw Defendant Bush's black Ford pickup truck at the Orrands home a few months after

-11-

Lynn's murder. [The Petitioner's] niece, Christy Rawls, testified that she stayed at [the Petitioner's] house during the summer of 1982 and that Defendant Bush would come over to the house. Ms. Rawls testified that she saw Defendant Bush kiss [the Petitioner] and that the two "appeared to be a couple." Gary testified that he recalled seeing Defendant Bush kiss [the Petitioner] in 1983. However, when [the Petitioner and Defendant Bush] spoke to Detective Jim Tramel of the Rutherford County Sheriff's Department, they denied having an affair and told Detective Tramel that they did not start dating until around 1985 or 1986.

Jackie Young testified that he was friends with Kevin in high school and that in 1981 Kevin asked him if he would "kill somebody for $10,000." When Mr. Young said no, Kevin told him that he was just joking. Mr. Young testified that he thought Kevin was serious before Kevin told him he was joking. Jason Riley testified that one night in 1981, he was in the parking lot of Jackson Heights when a black pickup truck with Kevin and another man inside pulled up. Mr. Riley had "hung out pretty good" with Kevin in high school and continued to "hang out" with him even after Mr. Riley had dropped out of high school. After the pickup truck pulled up, Kevin "hollered" for Mr. Riley to get in the truck. Mr. Riley testified that when he got into the truck, Kevin introduced the driver as "his sister's boyfriend." The driver pulled an envelope with $5,000 out of his jacket and handed it to Kevin. Mr. Riley testified that at the time, Kevin did not work and would not have had access to $5,000. Kevin placed the money on the dash and told Mr. Riley "this right here could be yours" if Mr. Riley would kill Kevin's brother-in-law. Kevin explained that his sister wanted her husband dead because "[h]e was abusive" and because [the Petitioner and Defendant Bush] wanted to marry. Mr. Riley testified that he refused to kill Lynn, but he agreed to "knock [Lynn] out and drag him to the street," where Kevin and Defendant Bush would "take out the trash."

On November 18, 1981, Mr. Riley met Kevin in the Hardee's parking lot. Kevin was in a black Ford pickup truck when he held up the envelope of money and said, "This right here could be yours." Mr. Riley testified that he could not remember if there was anyone else with Kevin in the pickup truck. Kevin had previously driven him by the Orrand house. However, that night, Mr. Riley took his own car because he does not "like being stranded nowheres." Mr. Riley testified that he could not remember where he parked his car, but he parked it "out of the way where nobody could see it." Mr. Riley walked about a block to Lynn's house and entered the garage through an

-12-

unlocked side door. Terry Orrand testified that the side door in the garage was always unlocked and that Lynn would always come in through that door. Mr. Riley brought a flashlight and a "tire tool" into the garage with him. Mr. Riley testified that the flashlight was to signal "two people in the truck," who were waiting at the abandoned church. Mr. Riley hid behind the door he had entered and waited until he heard Lynn park his car in the driveway, get out, and walk toward the side door of the garage. After Lynn walked through the door, Mr. Riley hit him in the head with the "tire tool." The blow did not knock Lynn out, and Mr. Riley ran out of the garage after Lynn either "pulled a gun or said he had a gun." Mr. Riley testified that he ran through the front yard, back to his car, and drove away. Mr. Riley also testified that he wore a green army jacket with a hood which had "fur around it." However, Mr. Riley later testified that he did not remember the hood of his jacket being lined with fur. Mr. Riley testified that he attacked Lynn because he was "young" and "dumb" and that after the attack Kevin "just seemed like he disappeared."

Kevin's ex-wife, Joyce Hudson, testified that in 1981, Kevin told her that [the Petitioner and Defendant Bush] were having an affair. Kevin also told her that [the Petitioner] was "looking for somebody to kill her husband ." Ms. Hudson testified that she told Kevin "to stay away from [the Petitioner]." Kevin also told Ms. Hudson that [the Petitioner and Defendant Bush] had "hired somebody to hit [Lynn] in the head and it didn't kill him." One day in 1981, Kevin asked Ms. Hudson to go with him to Jackson Heights to "get some pot." Kevin told her that "he wanted [her] to get down in the car because he didn't want this guy to see [her]." Ms. Hudson testified that even though she was pregnant at the time, it was not a problem for her to lie down in the seat because she "never showed" while she was pregnant. At one point, Ms. Hudson "peeked" out the window and saw a black Ford pickup truck parked next to the car. Ms. Hudson then saw Kevin put something in the trunk of the car that "was covered with a piece of cloth" and "was long." Ms. Hudson testified that it "looked like a gun." However, Ms. Hudson admitted on cross-examination that she originally told the police she thought Kevin had placed drugs in the trunk. After Kevin got back in the car, Ms. Hudson sat up. Kevin told her to get back down when the black Ford pickup truck drove by them. Ms. Hudson saw a man driving the truck and asked Kevin who it was. Kevin told her that it was Defendant Bush and that he was [the Petitioner's] boyfriend. Ms. Hudson testified that to her knowledge, Kevin did not own a gun at the time. Ms. Hudson also testified that she later saw Defendant Bush again in the same black truck he drove the night of the meeting. Defendant Bush's ex-wife, Ms. Conner, testified that Defendant Bush owned coveralls and "a long shotgun" at that time.

-13-

Ms. Hudson testified that after Kevin moved in with her parents, [the Petitioner] would call to speak to Kevin "a lot." The day after giving birth to her daughter, Kevin came into Ms. Hudson's hospital room and told her that he had shot Lynn. Kevin told her that he had parked at the abandoned church on Richland Road and "hiked up in the woods and waited on [Lynn]." Kevin told her not to tell anyone about it because [the Petitioner] was "crazy enough to have [Ms. Hudson] killed." Ms. Hudson testified that she did not believe that Kevin would kill Lynn because "[h]e didn't tell me he was going to do it." Ms. Hudson denied having any role in Lynn's murder and denied that she agreed to help Kevin with his alibi. Ms. Hudson testified that after the murder, she, Kevin, and their child moved in with [the Petitioner] for about two months. When [the Petitioner] "kicked them out," Kevin started calling her names and said that [the Petitioner] "wanted [Lynn] dead" and that she "wanted [Kevin] to kill him." Sometime after that, Kevin came to Ms. Hudson and told her they were going to have to leave town because he had told his "friends" that he had killed Lynn. Ms. Hudson testified that she was afraid to divorce Kevin and that he had threatened to kill her on "a couple of occasions." Ms. Hudson also testified that she was uncooperative with the police at first because she was afraid [the Petitioner] would have her killed.

John Patterson testified that when he found Lynn's body, he saw a set of foot prints that were similar to the footprints his boots left. John was wearing Herman boots that day and was so worried about the footprints that he "stomped them to cover them up." However, John noticed that the footprints were bigger than his. John testified that at the time of the murder, Kevin also owned a pair of Herman boots. Chief Gammon testified that Kevin became a suspect because he became uncooperative with the investigators and because his alibi was called into question. According to Chief Gammon, the community services coordinator with the Sheriff's Department, Don Castleman, had seen Kevin either reentering or leaving the hospital the morning of the murder. [The Petitioner's] neighbor, Ms. Perry, testified that on the day of the murder, [the Petitioner] was adamant that Kevin not be interviewed by the police because he "had been through enough already" that day. Mr. Riley testified that after the murder, he saw either John or Kevin in a store and asked how Lynn was. According to Mr. Riley, he was "all giggle" and said, "He died. Hunting accident." Ms. Perry testified that after Lynn's death, [the Petitioner] would blame Lynn anytime something bad happened to her. Ms. Perry also testified that in 1982 or 1983, [the Petitioner] asked if she could leave her car with Ms. Perry while [the Petitioner] and Defendant Bush

went on a vacation to Florida with their children.  Ms. Perry asked [the Petitioner] if she was going to get married, and [the Petitioner] "laughed and said, no, that she would lose her [S]ocial [S]ecurity."

When the investigation was reopened in 2007, the police asked Mr. Riley to make a controlled phone call to Kevin.  The phone call was recorded and monitored by the police.  Mr. Riley told Kevin that the police were asking him questions about the murder.  Kevin told Mr. Riley that he "didn't have nothing to do with the f———g s—t."  When Mr. Riley brought up the attack on Lynn in the garage, Kevin said that he did not "even know what you're talking about now," that he did not "know nothing about nothing," and that would "be the last word I'll say when I die."  Kevin testified that he denied everything to Mr. Riley because he assumed his phone was taped.  A day after making the controlled call to Kevin, Mr. Riley received a telephone call at work.  The caller did not identify himself, and Mr. Riley did not recognize the voice.  The caller said that he knew Mr. Riley had an upcoming interview with the police and told him "the best thing to do is stay calm, stay cool" and "[d]on't tell them nothing."  Mr. Riley informed Detective Tramel about the phone call and what the caller had said. Detective Tramel set up another controlled call, provided Mr. Riley with two phone numbers, and told Mr. Riley that they were for Defendant Bush's home and cell phones.  Mr. Riley called the home number first and got no answer.  Mr. Riley then called Defendant Bush's cell phone and spoke to a man.  The phone call was recorded, and Mr. Riley testified that the recording played at trial was the phone call he made to the number Detective Tramel provided him.

At the beginning of the phone conversation, Mr. Riley asked for "Gary."  Defendant Bush responded "Yeah."  Mr. Riley told Defendant Bush that he was in his truck and calling him because the police just left his workplace after interviewing him.  Defendant Bush told Mr. Riley that he did not "need to talk on that phone" because the police "can pick them up on a scanner." After reassuring Defendant Bush that the police were not close enough to monitor the call, Mr. Riley asked Defendant Bush "what do you want to do."  Defendant Bush responded that he did not "want to do nothing" and that Mr. Riley needed to "[j]ust stay cool like I told you."  Defendant Bush told Mr. Riley that the police were "gonna aggravate you for a while" and that Mr. Riley "better do" what he told him.  Mr. Riley testified that he recognized Defendant Bush's voice as the voice of the earlier caller and that he "knowed right off the bat who it was."  However, Mr. Riley testified that he "couldn't put a name to" the voice but that he could identify the voice as the same person

-15-

who called him at work. After listening to a portion of the recording, Detective Tramel, Terry Orrand, and Ms. Rawls were all able to identify Defendant Bush's voice as the person speaking with Mr. Riley. Detective Tramel also testified that he was present during the recording of the phone conversation and that the voices belonged to Mr. Riley and Defendant Bush. A day after the controlled call, Mr. Riley got another phone call from Defendant Bush in which Defendant Bush asked how the police interview went and told Mr. Riley to "lose his phone number" and "don't say nothing to nobody."

Kristi Dunnan testified that she was Kevin's probation officer and that in the summer of 2007 Kevin was delinquent on his probation fees and fines. However, in August 2007 Kevin was able to pay off his fees in two separate payments totaling $1,052. Jeff Witas, [the Petitioner's and Defendant Bush's] neighbor, testified that in 2007, Defendant Bush asked him if he could get Kevin a job. Defendant Bush had the two meet in his garage because Mr. Witas wanted to meet Kevin to see what his qualifications were. Gary Orrand testified that [the Petitioner] does not like to hear his son's middle name, Lynn. Gary also testified that [the Petitioner] told him she wanted to contest the exhumation of Lynn's body. However, she ultimately decided not to contest the exhumation. Terry Orrand testified that he spoke with his mother after he found out that she had hired an attorney to contest the exhumation. According to Terry, when he spoke with [the Petitioner] about the exhumation she "turned pale" and "looked more frightened than she did upset." Terry also testified that he had never seen [the Petitioner] cry over Lynn's death until the trial started. Terry admitted on cross-examination that he has sued [the Petitioner] for $5 million in a wrongful death action. Based upon the foregoing evidence, the jury convicted [the Petitioner and Defendant Bush] of first-degree murder.

State v. Candance Orrand Bush and Gary W. Bush, No. M2010-00186-CCA-R3-CD, 2011 WL 2848266, at *1-12 (Tenn. Crim. App. July 18, 2011), perm. app. denied, (Tenn. Nov. 17, 2011) (footnotes omitted). This court affirmed the Petitioner's judgment of conviction, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal thereafter. Id.

On November 13, 2012, the Petitioner filed a timely, *pro se* petition for post-conviction relief. Following the appointment of counsel, no amended petition was filed on behalf of the Petitioner. However, on December 4, 2012, the Petitioner filed a *pro se* amendment to her petition. The State filed its response on July 12, 2013.

At an evidentiary hearing before the post-conviction court, the Petitioner testified that, leading up to trial, trial counsel prepared her to testify in her own behalf and she understood that she would be testifying. During trial, however, counsel told the Petitioner that he did not want her to testify and he would not put her on the witness stand. Counsel offered no rationale for not calling the Petitioner as a witness, except to say that the Petitioner was not going to testify "[b]ecause it was a murder case." Although trial counsel explained to the Petitioner that it was her choice whether to testify, the Petitioner followed trial counsel's advice and did not testify because trial counsel previously stated that "[h]e was in charge."

If called as a witness at trial, the Petitioner would have denied that she was having an affair with Defendant Bush at the time of the victim's murder. She explained that she worked at Gemtop on two different occasions and she did not begin dating Defendant Bush until her second term of employment at Gemtop in 1988. The Petitioner acknowledged that, as testified to by Gemtop employees, she talked to Defendant Bush before the victim's murder but maintained that their conversations had been work-related. The Petitioner stated that the Gemtop employees that testified for the State about the nature of her and Defendant Bush's relationship prior to the murder were either mistaken or lying. The Petitioner believed that the State's witnesses possibly confused her first period of employment at Gemtop with the second period of employment.

The Petitioner stated that, had she testified at trial, she would have denied having anything to do with the victim's murder. She would have testified that she did not conspire with anyone to kill the victim and she had nothing to do with Mr. Riley's attacking the victim months before the murder. The Petitioner explained that she had no prior criminal record at the time of trial and thus could not have been impeached based upon prior convictions. The Petitioner could think of no reason why her brother, Kevin Patterson, had confessed to killing the victim and agreed to a 25-year prison sentence.

The Petitioner recalled that, while she routinely followed trial counsel's advice after he informed her that he was "in charge," she did not follow his advice when he recommended that they file a motion to sever her case from Defendant Bush's case. Trial counsel was concerned about the recording of Defendant Bush's phone conversation with Mr. Riley, and counsel told the Petitioner that because of the tape he thought it best that her case be separated from Defendant Bush's. The Petitioner did not want a severance, and trial counsel could not persuade her otherwise. The Petitioner explained that she did not want the cases separated "[b]ecause I knew we didn't have anything to do with the murder of my husband. So, I didn't feel that we should be separated." Regarding the tape offered by the State that allegedly contained Defendant Bush's voice, the Petitioner testified that her voice was not on the tape and it did not hurt her. The Petitioner explained that, if she had testified and been asked to identify Defendant Bush's voice on the tape, she would have said that the voice on the tape was not that of Defendant Bush.

Trial counsel testified that the Petitioner had two attorneys, an investigator, and a paralegal assigned to work on her case. Trial counsel recalled that, during his representation of the Petitioner, he and the Petitioner interacted well. Counsel explained that the defense theory at trial was that Mr. Patterson was not telling the truth and, if Mr. Patterson committed the murder, the State offered him the plea deal in exchange for implicating Defendant Bush and the Petitioner. Another strategy employed by the defense was to focus the jury on the initial police investigation into the victim's death. In 1982, the victim's death was ruled an accident, and trial counsel explored this issue while cross-examining the State's witnesses. Trial counsel also attacked Mr. Patterson's story at trial, cross-examining him for six hours. Counsel challenged Mr. Patterson's claim about the National Guard Armory. He subpoenaed the historian from the Armory, who testified that the Armory in question was not built until after the victim's murder. Trial counsel also challenged Mr. Patterson's testimony that he shot the victim from the front as this testimony differed from the pathologist's physical findings. Regarding his cross-examination of Mr. Patterson, trial counsel stated, "And to tell you the truth, we did totally destroy him. But the jury believed him. I mean, it's just that simple. That's where this case was."

Trial counsel recalled that he and the defense investigator took "great pains" to prepare the Petitioner to testify. As the case unfolded during trial, counsel discussed with the Petitioner each day's proof and assessed the case with the Petitioner each day. During their conversations, trial counsel discussed the questions the Petitioner would be subjected to on cross-examination and how the risks of her testimony might outweigh whatever benefit it could offer. Regarding his advice to the Petitioner that she not testify, trial counsel explained:

> If [the Petitioner] had testified in this case, and that's what we talked about, she would have had to have identified that voice on that tape. She would have had to have called about 20 people liars, including her own Mama. And that just doesn't play well for a jury.

Trial counsel testified that he watched the jury during the trial, looking for signs as to whether or not certain testimony hurt the defense, as this went to his assessment of whether the Petitioner should testify. Trial counsel further explained that another factor he considered was whether the Petitioner would have made a good, strong witness. Counsel believed that the Petitioner would not have been a good witness and the prosecutor would have "eaten her up" on cross-examination.

Based upon their discussions, the Petitioner made the decision not to testify. The trial court conducted a Momon hearing, questioning the Petitioner about her understanding of her right to testify and ensuring that her decision not to testify was free and voluntary.

Trial counsel testified that, after the Petitioner's trial, he wondered if he should have pressed the issue of severance more forcefully with the Petitioner because he believed that the tape purporting to include Defendant Bush's statement was hurtful to the Petitioner. However, the Petitioner was emphatic that her and Defendant Bush's defenses were "tied together" and "she wouldn't hear of [a severance]." Ultimately, trial counsel concluded, "I don't believe [the trial court] would have been required to grant [a motion to sever]. And I don't believe [the trial court] would have been reversed on appeal, but it would have given me something else to argue about."

Following this testimony, the Petitioner waived argument and submitted the case to the post-conviction court. Thereafter, the post-conviction court entered a written order denying the petition. This timely appeal followed.

## II. Analysis

In order to prevail upon a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2014); Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Whether the petitioner has met his burden of proof is a question of law that this court reviews *de novo*. Arroyo v. State, 434 S.W.3d 555, 559 (Tenn. 2014).

Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). We review a trial court's findings of fact under a *de novo* standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. Id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law are reviewed "under a purely *de novo* standard, with no presumptions of correctness . . . ." Id. When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." Id. at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." Id. (citing Henley, 960 S.W.2d at 579).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, §

-19-

9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, a review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

*Advice That Petitioner Not Testify*

The Petitioner first argues that she received ineffective assistance of counsel based upon trial counsel's advice that she not testify at trial. The Petitioner cites State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991) in support of her claim that trial counsel was ineffective.

The defendant in Zimmerman was charged with second-degree murder, and trial counsel planned to employ a theory of self-defense based upon "battered wife syndrome." Id. at 221-22. In opening statements, trial counsel announced to the jury that they would hear

-20-

testimony from the defendant, as well as testimony from a psychologist regarding battered wife syndrome. Id. However, despite there being "no surprises in the presentation of the state's case," defense counsel advised the defendant not to testify and did not present the testimony of the psychologist. Id. at 224. The defense rested without presenting any proof, and the defendant was convicted. Id. at 222.

In concluding that trial counsel rendered ineffective assistance, this court reasoned that "there appear[ed] to have been no basis for the sudden change in strategy." Id. at 226. The court went on to cite the following five factors that "would tend to indicate ineffective assistance" in a case where trial counsel fails to call the defendant to testify:

> (1) only the victim and the defendant were present when the offense was committed;

> (2) only the defendant could present a "full version of her theory of the facts";

> (3) the defendant's testimony could not be impeached by prior criminal convictions;

> (4) the defendant could give an account of the relationship with the victim; and

> (5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

Id. at 227 (quoting from State v. Dorothy Renate Gfeller, No. 87-59-III, 1987 WL 14328, at *5 (Tenn. Crim. App. July 24, 1987)).

Zimmerman is distinguishable from the Petitioner's case for several reasons. The instant case is not one in which only the victim and the defendant were present when the offense was committed, and there is no evidence that trial counsel let in objectionable, prejudicial testimony with the intention of clarifying it with the Petitioner's testimony. Moreover, the court in Zimmerman placed great weight on the fact that trial counsel promised the jury in the opening statement that it would hear from the psychologist and the defendant. This court held that "'[t]he trial attorney should only inform the jury of the evidence that he is sure he can prove . . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation.'" Id. at 225 (quoting McCloskey, Criminal Law Desk Book § 1506(3)(O)). There is no evidence in this case that trial counsel told the jury that the Petitioner would testify.

The <u>Zimmerman</u> court was also concerned with trial counsel's sudden and unexplained change in strategy, which appeared arbitrary rather than logical and deliberate. <u>See</u> <u>id.</u> at 226. In rejecting the Petitioner's claim in this case, the post-conviction court found that the Petitioner was "not credible" when she testified that, during trial, counsel abruptly and without further elaboration told her that he would not put her on the stand "because it was a murder case." Rather, trial counsel testified about his careful assessment of the proof and the jury's reaction to it as the trial unfolded. He explained that, if the Petitioner had testified, she would essentially have to call "about 20 people liars, including her own Mama." Trial counsel also considered that the Petitioner would not make a good witness and would not have fared well under cross-examination.

Finally, the <u>Zimmerman</u> court was particularly concerned that defense counsel failed to present any witnesses or evidence on the defendant's behalf despite the existence of evidence that could have helped her case. <u>See</u> <u>id</u>. Unlike in <u>Zimmerman</u>, trial counsel for the Petitioner presented two witnesses on the Petitioner's behalf. The testimony from these defense witnesses called into question key aspects of Mr. Patterson's account of his shooting the victim. Therefore, we agree with the post-conviction court that the Petitioner has not met her burden of establishing by clear and convincing evidence that trial counsel was constitutionally ineffective based upon counsel's advice that the Petitioner not testify at trial.

*Failure to File a Motion for Severance*

The Petitioner also argues that she was denied effective assistance of counsel based upon trial counsel's failure to file a motion to sever her case from that of Defendant Bush. The post-conviction court did not address the issue of trial counsel's failure to file a motion for severance in its order denying relief. The post-conviction court noted, however, that the initial and amended petitions contained many allegations that were not addressed by the Petitioner at the hearing. The court also noted that the Petitioner raised at least one additional issue at the hearing but had failed to include the issue in her petition. The court determined that any allegations not presented at the hearing or not included in the petition for post-conviction relief were waived.

Upon a review of the record, it is clear that the Petitioner failed to raise this issue in her initial petition for post-conviction relief or in any amended petition. Additionally, although there was some testimony about trial counsel's attempts to persuade the Petitioner to file a motion to sever, the Petitioner did not argue the failure to file a motion to sever as a basis for her ineffective assistance of counsel claim before the post-conviction court. Thus, we determine that the Petitioner has waived our consideration of this issue, and it will not be addressed on appeal. <u>See, e.g.</u>, <u>Butler v. State</u>, 789 S.W.2d 898, 902 (Tenn. 1990) (finding that an issue was waived because it was not litigated in the trial court); <u>State v. Turner</u>, 919

S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) (stating that an issue which was neither raised nor litigated in the trial court is waived and that a party may not raise an issue for the first time in appellate court).

*Cumulative Effect of Trial Counsel's Errors*

Finally, the Petitioner contends that the cumulative effect of trial counsel's errors undermines the confidence in the outcome of the trial such that she is entitled to post-conviction relief. Cumulative error consists of "multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated have a cumulative effect on the proceedings so great as to require a reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." Id. (internal citations omitted). In the post-conviction context, a petitioner cannot successfully claim she was prejudiced by counsel's cumulative error when the petitioner failed to show counsel's performance was deficient. Tracy F. Leonard v. State, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. July 5, 2007), appeal dismissed, (Tenn. Sept. 13, 2007) (citing Leon J. Robins v. State, No. M2005-01204-CCA-R3-PC, 2006 WL 1816361, at *20 (Tenn. Crim. App. June 27, 2006), perm. app. denied, (Tenn. Oct. 30, 2006)). Because we have considered the Petitioner's issues on appeal and concluded that she is not entitled to relief for any alleged error, we need not consider the cumulative effect. The Petitioner is not entitled to relief.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE